```
 1            IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF OREGON

 3

 4   JENNIFER BACON,                )
                                    )
 5             Plaintiff,           ) No. 3:18-cv-01925-YY
                                    )
 6        vs.                       )
                                    )
 7   DEPARTMENT OF HUMAN SERVICES,  )
     a subdivision of the State of  )
 8   Oregon; and SONJA BUCCHOLTZ,   )
     an individual,                 )
 9                                  )
               Defendants.          )
10

11

12

13           DEPOSITION OF CHARLES ANDERSON

14          Taken in behalf of the Defendants

15

16                  January 24, 2020

17

18                     *   *   *

19

20

21

22

23   REPORTED BY:  COLLEEN R. MCCARTY
     CSR NO. 00-0371
24   Independent Contractor for Duffey Court Reporting
     420 NW 2nd Street
25   Corvallis OR 97330
```

```
 1                  CHARLES ANDERSON,
 2   was thereupon produced as a witness, and having been
 3   first duly sworn/affirmed by the Certified Shorthand
 4   Reporter, was examined and testified as follows:
 5
 6                     EXAMINATION
 7   BY MS. NORDYKE:
 8   Q.  Good morning, Mr. Anderson.  Do you prefer
 9       Mr. Anderson or Detective Anderson?
10   A.  Either is fine with me.
11   Q.  Okay.  My name's Vanessa Nordyke.  Thank you for
12       being here today.  Are you represented by counsel
13       today?
14   A.  Yes.
15   Q.  And is that Mr. Harvey?
16   A.  Yes.
17   Q.  When did you retain Mr. Harvey?
18   A.  It was November sometime.  November 2019.
19   Q.  Do you remember --
20           MR. HARVEY:  Before you continue this, I'm
21       going to ask that this person be excluded.  She's
22       not a party to the case.
23           MS. NORDYKE:  She's DOJ staff.
24           MR. HARVEY:  I don't care.  She's a witness in
25       this case, and she's not going to participate in
```

1    when did you develop this impression of DHS?  Is
2    this over time?
3 A. So varying impressions of different workers.  The
4    first worker that I really remember having kind of
5    noted issues with him and kind of the lack of
6    supervision over him was a guy named
7    Fred Washington.  And that goes back to probably
8    '05, '06-ish, maybe.  It was before I was in
9    investigations.
10 Q. Who else?  What other DHS caseworkers helped form
11    this impression of DHS for you?
12 A. Just various supervisors over the years.  Some of
13    them I can't even recall at this point.  Had some
14    concerns with Lamont Boyd making some decisions
15    regarding a case that I didn't agree with.
16        The incident with Miguel Fuentes certainly
17    shaped that significantly, seeing just the amount of
18    fraud that he'd been able to perpetrate over
19    whatever period of time and that it didn't seem to
20    be as big of a concern to some of the DHS
21    supervisors that I expected it would be.
22 Q. Which DHS supervisors?
23 A. Catherine Chase, Sonja Buccholtz, Rolanda Garcia, I
24    think.
25 Q. And what led you to believe they weren't -- I forget

1  how you phrased it -- weren't taking it seriously, I
2  guess?
3  A. Weren't concerned. So in the process of doing the
4  investigations, misdemeanor investigations, I only
5  went about three months in his case reports,
6  which -- so just to give you a little bit of the
7  timeline on that one.
8      So we identified concerns with Miguel
9  November 10, 2016. Notified DHS supervisor about
10 that time. We interviewed him November 18th. Got a
11 couple of his reports from, I think, the day or two
12 surrounding the specific investigation that we were
13 looking at.
14     By December 27th had greater concerns, and I
15 e-mailed Catherine Chase to ask for, essentially, a
16 three-month kind of swathe of the cases that he
17 investigated, which for purposes of a criminal
18 investigation were really more than what we needed.
19 We ended up with over 30 misdemeanor accounts on
20 him.
21     From a law enforcement perspective, didn't make
22 any sense to go back further than that. But even
23 through that we identified cases, I want to say one
24 as far back as 2014 that he had falsified. And they
25 were kind of clear cut, very specific provable

1              falsifications.
2                   I think in the 2014 case specifically he said
3              that he had gone to interview a woman in jail about
4              her children, listed the date and time that he went
5              to interview them.  Jail didn't have any record of
6              him coming into the facility at that time or any
7              time, actually.  But most telling, she had been --
8              she was out of custody at the time that he said he
9              went and visited her, so she wasn't even at the
10             jail.
11                  So it kind of for my thoughts, okay, you know
12             that -- by probably February we knew that out of the
13             cases he had in those three months he had falsified
14             18 out of 24 of them.  My -- you know, if I was a
15             supervisor, I'd be going back further, because there
16             were clearly children that were at risk that he just
17             hadn't bothered to do the proper investigation on.
18   Q.  I'll stop you there.  Thank you.  I feel like you
19       answered the question and then some.
20   A.  Okay.
21   Q.  So if I remember, you said earlier in your answer
22       that you contacted Catherine Chase to request more
23       of the -- were they 307s that Mr. Fuentes had worked
24       on or other reports --
25   A.  His complete assessment reports.  I don't know what

1  they call them when they're completed, if it's still
2  a 307 or something different.
3  Q. I don't know either. So you worked with
4  Catherine Chase on this. Did you work with any of
5  the other managers that you mentioned earlier,
6  Rolanda Garcia or Suzie Buccholtz?
7  A. Rolanda talked to me about it on a couple of
8  occasions, and I got the distinct impression from
9  her that her primary concern was the public
10 perception of DHS as opposed to the risk that Miguel
11 had presented to kids by not investigating anything.
12 Q. What did she say that gave you that impression?
13 A. Well, all her questions were focused around public
14 media releases, how our agency was going to handle
15 what we were talking about as opposed to how DHS was
16 going to fix any of the systemic issues that allowed
17 him to, basically, do 25 percent of his work for a
18 quarter of the year.
19 Q. When did you speak with Rolanda? Was this before or
20 after you worked with Catherine Chase on getting
21 those reports?
22 A. Before -- yeah, it was before getting those reports.
23 So it would have been after November 10th, I believe
24 it was at an MDT meeting, so it would have been the
25 second Tuesday of November.

1    or other type of complaint against DHS?
2  A. I'm sorry, I should ask, are we including Jennifer
3    in these or no?
4  Q. Yes, we are.
5  A. Oh, might want to go back to the beginning of that
6    question, then. I thought we were excluding her on
7    those. My apologies.
8  Q. That's all right. I appreciate you clarifying.
9    We'll start over. So let me see.
10       Have you ever helped a current or former
11   employee pursue a lawsuit against DHS?
12 A. I mean, providing advice and that thing, I guess,
13   yes, with Jennifer's current suit. I haven't helped
14   with any of the filings or investigations or
15   anything like that, but just acting as a sounding
16   board for different ideas.
17 Q. What ideas would those be?
18 A. Just that she should file a lawsuit, that what they
19   did was wrong.
20 Q. What do you recall specifically about that? File a
21   lawsuit for what purpose?
22 A. I know there were some issues where they were --
23   seemed like they were faulting her for taking FMLA
24   leave, that I knew she was -- well, this gets into
25   the whistleblower part. But, you know, I knew she

was important on the Miguel Fuentes case. Was going on at the same time they were playing their games with the Irvine case, and then all of a sudden that resulted in disciplinary proceedings within a month or two after we arrested Miguel, which seemed problematic.

Q. How was she important in the Fuentes case?

A. She was the one who, basically, gave me all my background information on how DHS worked and how their investigations worked. You know, I knew from -- I knew from my perspective what they did when I was there, but what I didn't know was what they do when law enforcement's not there.

So the reporting processes, practices about how to -- you know, when cases are supposed to be worked, things like that.

Additionally, all the background information she gave me, helping to understand kind of what was going on with his time sheets, schedule, different codes he had in his report writing. And she also told me that she had told her supervisor that he was not working.

Kind of initially when I got it -- so November 10th was kind of the first time that we realized, wait a minute, there's an issue with

1  Miguel, but at the same time he's a community
2  partner and I didn't really want to believe that
3  what I was seeing I was seeing.
4       You know, at some point fairly early on I know
5  I talked to Jennifer about it, and she's like, "Oh,
6  no, we've had issues with him.  I just talked to a
7  supervisor recently."  I don't remember exactly when
8  she said she did, but it was prior to that.  And
9  was, essentially, told, you know, stay in the lane,
10 it's not my business.
11      You know, at that point I still -- I still
12 wanted -- excuse me.  I mean, I wanted to believe
13 that the parent in the case was lying to me about
14 Miguel, that he had actually done what he said he
15 did, but the evidence just kept stacking up that
16 said he didn't.
17 Q. Did Jennifer tell you when she had talked to a
18    supervisor about Miguel Fuentes?
19 A. I don't remember exactly when it was.  I know it had
20    been at least a couple months prior to that, but I
21    don't recall her specifically at the time telling
22    me, you know, it was July or August or September,
23    whenever.
24      MR. HARVEY:  Judge You is going to call.
25      MS. NORDYKE:  Great.  Thank you.

```
 1                C E R T I F I C A T E
 2
 3       I, Colleen R. McCarty, Certified Shorthand
 4   Reporter, do hereby certify that **CHARLES ANDERSON**
 5   appeared before me at the time and place mentioned in
 6   the caption herein; that the witness was by me first
 7   duly sworn/affirmed, and examined upon oral
 8   interrogatories propounded by counsel; that said
 9   examination, together with the testimony of said
10   witness, was taken down by me in stenotype and
11   thereafter reduced to typewriting; and, that the
12   foregoing transcript, Pages 1 to 135, both inclusive,
13   constitutes a full, true, and accurate record of said
14   witness, and of all other oral proceedings had during
15   the taking of said deposition, and of the whole thereof,
16   to the best of my ability.  I further certify review of
17   the transcript was not requested.
18       Witness my hand at Corvallis, Oregon, this 4th day
19   of February, 2020.
20
21
22                          _____
23                          Colleen R. McCarty, RPR
24                          OR CSR No. 00-0371 Exp: 9/30/21
25                          WA CCR No. 2044 Exp: 4/6/20
```